**[ORAL ARGUMENT NOT YET SCHEDULED]**
**Nos. 14-1021, 14-1031**

_____

### 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

### MIKE-SELL'S POTATO CHIP COMPANY,

*Petitioner and Cross-Respondent,*

**v.**

### NATIONAL LABOR RELATIONS BOARD,

*Respondent and Cross-Petitioner.*

_____

## ON PETITION FOR REVIEW FROM A DECISION OF THE NATIONAL LABOR RELATIONS BOARD

_____

## BRIEF FOR PETITIONER AND CROSS-RESPONDENT

_____

Jennifer R. Asbrock  (0078157)
Eric S. Clark (0071035)
THOMPSON HINE LLP
Austin Landing I
10050 Innovation Drive, Suite 400
Dayton, Ohio  45342-4934
Tel. (937) 443-6849
Fax. (937) 443-6635
Jennifer.Asbrock@ThompsonHine.com
Eric.Clark@ThompsonHine.com

*Counsel for Petitioner and Cross-Respondent, Mike-sell's Potato Chip Company*

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

### A.     Parties And Amici

Petitioner and Cross-Respondent in this case is Mike-sell's Potato Chip Company ("Mike-sells" or "Company").  Respondent and Cross-Petitioner is the National Labor Relations Board ("Board").

### B.     Ruling Under Review

The ruling under review is a Decision and Order ("Order") issued on January 15, 2014, by the Board, which is reported at 360 NLRB No. 28.  (JA741.) The Order affirms a Decision and Order ("Decision") of Administrative Law Judge Geoffrey Carter ("ALJ") that the Company violated 29 U.S.C. § 158, Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act ("NLRA").  (JA741.)

### C.     Related Cases

This case has not previously been before this Court or any other court. Other than Case No. 14-1031 which has been heretofore consolidated with Case No. 14-1021, Mike-sell's is not aware of any other related cases currently pending in this Court or in any other court.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and D.C. Circuit Rule 26.1, Mike-sell's hereby makes the following disclosures:

Mike-sell's is a privately-held manufacturer and distributor of snack food products.  Mike-sell's has no parent corporations, and no publicly held company has a 10% or greater ownership interest in Mike-sell's.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND
RELATED CASES ........................................................................................ i

    A.    Parties And Amici ............................................................... i

    B.    Ruling Under Review ........................................................ i

    C.    Related Cases ..................................................................... i

CORPORATE DISCLOSURE STATEMENT ............................................ ii

TABLE OF CONTENTS ............................................................................ iii

TABLE OF AUTHORITIES ....................................................................... v

GLOSSARY ............................................................................................. vii

JURISDICTIONAL STATEMENT ............................................................ 1

STATUTES AND REGULATIONS ........................................................... 1

ISSUE PRESENTED FOR REVIEW ......................................................... 1

STATEMENT OF THE CASE .................................................................... 2

STATEMENT OF THE FACTS ................................................................. 3

I.    Background ............................................................................. 3

II.    Bargaining Relationship And History ..................................... 4

III.    The Company's Financial Condition ........................................ 7

IV.    The Three Key Issues ............................................................. 8

    A.    Commissions .................................................................... 8

    B.    Healthcare ...................................................................... 10

    C.    Pensions ......................................................................... 10

V.    The October 10th Bargaining Session  (*See* JA255, at JA258) ..................... 11

VI.    The October 24th Bargaining Session  (*See* JA255, at JA285) ..................... 13

VII.   The Company's Ongoing Efforts To Facilitate Negotiations .......................14

VIII.  The November 14th Bargaining Session  (*See* JA255, at JA296)................14

IX.    Impasse And Implementation........................................................................17

X.     Post-Implementation Bargaining Sessions ...................................................20

SUMMARY OF THE ARGUMENT ......................................................................23

STANDING ............................................................................................................26

STANDARD OF REVIEW ....................................................................................26

ARGUMENT ..........................................................................................................27

I.     The Record Shows That The Parties Were At Impasse On November
       19th, So The Board's Order Is Not Supported By Substantial
       Evidence..........................................................................................................28

       A.     The ALJ Failed To Properly Analyze Evidence Pertaining To
              The Union's Dilatory Motives And Pre-Implementation Delay.........32

       B.     The ALJ Made Improper Assumptions Of Fact, Applied
              Distinguishable Caselaw, And Considered Irrelevant Facts In
              Determining That No Impasse Existed. ..............................................36

II.    The Board's Order Depends On Improperly Admitted Evidence About
       Post-Implementation Bargaining Sessions ....................................................43

CONCLUSION .......................................................................................................47

CERTIFICATE OF COMPLIANCE.......................................................................49

CERTIFICATE OF SERVICE ...............................................................................50

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Court Cases**

*Dallas Gen. Drivers, Local No. 745 v. NLRB*,
    355 F.2d 842 (D.C. Cir. Jan. 6, 1966) ................................................................30

*Eastern Omni Constructors, Inc. v. NLRB*,
    170 F.3d 418 (4th Cir. March 9, 1999) ...............................................................27

*\*Laurel Bay Health & Rehab. Ctr. v. NLRB*,
    666 F.3d 1365 (D.C. Cir. Jan. 20, 2012) ........... 28, 29, 30, 31, 32, 40, 42, 43, 44

*NLRB v. Cutting, Inc.*,
    701 F.2d 659 (7th Cir. March 2, 1983) ...............................................................28

*NLRB v. H & H Pretzel Co.*,
    831 F.2d 650 (6th Cir. Oct. 19, 1987) ...........................................................33, 35

*Television & Radio Artists v. NLRB*,
    395 F.2d 622 (D.C. Cir 1968) .............................................................................30

*Thomas v. NLRB*,
    213 F.3d 651 (D.C. Cir. June 9, 2000) ...............................................................27

*\*TruServ Corp. v. NLRB*,
    254 F.3d 1105 (D.C. Cir. July 6, 2001) ....... 26, 27, 28, 29, 30, 31, 32, 33, 38, 43

*TRW, Inc. v. NLRB*,
    654 F.2d 307 (5th Cir. Aug. 24, 1981) ...............................................................27

**Board Cases**

*CBC Industries*,
    311 NLRB 123 (1993) ...........................................................................36, 37, 38

*Dependable Bldg. Maintenance Co.*,
    276 NLRB 27 (1985) ...........................................................................................47

*Dixon Distribution Co.*,
    211 NLRB 241 (1974) .........................................................................................29

*Grinnell Fire Protection Sys. Co.*,
    328 NLRB 585 (1999) .........................................................40, 41, 42

*Hi-Way Billboards, Inc.*,
    206 NLRB 22 (1973) ...............................................................29, 44

*M & M Contractors*,
    262 NLRB 1472 (1982) ............................................................33, 35

*McClatchy Newspapers, Inc.*,
    321 NLRB 1386 (1996) ..................................................................44

*Nat'l Gypsum Co.*,
    2013 NLRB LEXIS 319 (2013) .......................................................43

*Newcor Bay City Division*,
    345 NLRB 1229 (2005) ......................................................36, 37, 38

*Taft Broadcasting Co.*,
    163 NLRB 475 (1967) ...............................................................29, 30

## Statutes

29 U.S.C. § 158...............................................................1, 2, 23, 26

29 U.S.C. § 160 ...................................................................................1

## Other Authorities

Fed. R. App. P. 15 ...............................................................................1

Fed. R. App. P. 32 .............................................................................49

D.C. Circuit Rule 25 ..........................................................................51

D.C. Circuit Rule 28 ..........................................................................26

D.C. Circuit Rule 31 ..........................................................................51

D.C. Circuit Rule 32 ..........................................................................49

\* Authorities chiefly relied upon.

# GLOSSARY

ALJ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Administrative Law Judge

NLRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . National Labor Relations Act

OTR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . "Over-The-Road" Drivers

## JURISDICTIONAL STATEMENT

Mike-sell's timely filed its Petition for Review on February 10, 2014, to appeal the Order, reported at 360 NLRB No. 28, issued by the Board on January 15, 2014, in Board Case No. 09-CA-094143.  (JA741.)  The Order was a final agency action that affirmed the ALJ Decision issued on June 18, 2013, that the Company violated 29 U.S.C. § 158, Sections 8(a)(1) and 8(a)(5) of the NLRA. (JA741.)  The United States Court of Appeals for the District of Columbia Circuit has jurisdiction over the Company's appeal pursuant to 29 U.S.C. § 160(f) and Rule 15(a) of the Federal Appellate Rules of Procedure.

## STATUTES AND REGULATIONS

All applicable statutory provisions are contained in the addendum to this Principal Brief.

## ISSUE PRESENTED FOR REVIEW

Mike-sell's respectfully submits that the following issue is presented for review:  Whether the Board erred by issuing an Order affirming the Decision of the ALJ issued on June 18, 2013, that Mike-sell's violated Sections 8(a)(1) and 8(a)(5) of the NLRA on November 19, 2012, by unilaterally implementing its last, best, and final offers ("Final Offers") for two bargaining units represented by the Union without bargaining to impasse; and that Mike-sell's must provide back wages and benefits to the present date.

## STATEMENT OF THE CASE

On November 30, 2012, the Union filed an unfair labor practice charge, Charge No. 09-CA-094143, which was later amended on February 1, 2013. The Amended Charge alleged that Mike-sell's violated Sections 8(a)(1) and 8(a)(5) of the NLRA on November 19, 2012, by unilaterally implementing its Final Offers.

On February 21, 2013, the Board filed a Complaint alleging that the Company violated Sections 8(a)(1) and 8(a)(5) of the NLRA on November 19, 2012, by unilaterally implementing its Final Offers for two bargaining units represented by the Union without bargaining to impasse. (JA007.) The Company denied these allegations, and a trial was held on April 15-17, 2013 in front of the ALJ.

On June 18, 2013, the ALJ issued his Decision holding that the Company's decision to implement its Final Offers for the warehouse, route sales, and over-the-road drivers was an unfair labor practice because the parties had not reached a bargaining impasse. (JA741.) The Company timely filed exceptions to this Decision before the Board, contending that a legitimate bargaining impasse had indeed been reached. (JA735.)

On January 15, 2014, the Board issued its Order upholding the ALJ's Decision that no impasse existed and, thus, that the Company's implementation of its Final Offers was unlawful. (JA741.) The Board's Order led Mike-sell's to file a Petition for Review on February 10, 2014.

## STATEMENT OF THE FACTS

### I.     Background

Mike-sell's is a privately-held manufacturer and distributor of snack foods and is headquartered in Dayton, Ohio.  (JA348, JA351.)  While the Company has been in business for over a century, it has suffered significant financial losses over the past several years.  (JA555.)  The primary reason for the Company's ongoing losses is the competitive imbalance between Mike-sell's and its primary competitor, Frito-Lay.  (JA473-JA475, JA556-JA558.)  Unlike Frito-Lay, Mike-sell's cannot afford to intentionally discount the price for its products so deeply as to knowingly take a loss for a temporary period in order to steal away store shelf space and sales volume from smaller competitors.  (JA558-JA560.)  And while Frito-Lay owns its own potato farms, Mike-sell's must buy raw ingredients on the open market.  (JA559.)  The Company's financial condition and competitive struggles are not unique in its industry.  Across the country, small snack manufacturers see Frito-Lay as a fierce, national competitor with the ability to price local concerns out of business.  (JA473, JA557-JA559.)

Mike-sell's has two production facilities, one of which is in Dayton, Ohio. (JA555.)  Mike-sell's manufactures and packages snack products at its Dayton operation and then distributes them to Ohio, Indiana, and Kentucky through the help of route sales drivers, over-the-road ("OTR") drivers, and independent distributors.

- 3 -

(JA555.)  At the time of the ALJ hearing in this case, Mike-sell's employed about 10 warehouse workers (i.e., employees who pack boxes of product onto pallets); about 30 route sales drivers (i.e., employees who deliver and sell products directly to stores); and about four OTR drivers (i.e., employees who deliver products to warehouses, stand-alone storage bins, and distribution centers).  (JA346-JA348, JA674-JA676.)  Mike-sell's formerly employed about 60 route sales drivers, but as will be explained below, the Company was forced in 2012 to close several distribution centers and turn its sales routes over to independent distributors (i.e., independent businesses who buy and re-sell Company products).  (JA347, JA385-JA386, JA556, JA586.)   Mike-sell's has also laid off a number of nonunion employees and salaried staff.  (JA556, JA592.)

## II.    Bargaining Relationship And History

Mike-sell's warehouse workers are represented by the Union, and their employment was formerly governed by a labor agreement effective October 26, 2008, through October 26, 2012.  (JA060, JA345.)  Mike-sell's route sales drivers and OTR drivers are also represented by the Union, but in a separate bargaining unit, and their employment was formerly governed by a different labor agreement effective November 17, 2008, through November 17, 2012. (JA020, JA345.) Mike-sell's and the Union met several times to negotiate successor labor agreements for these two units, although negotiations for each unit were held separately.  (JA344.)

In fact, the route sales negotiations have been separate from the OTR negotiations, even though those two groups of drivers are in the same bargaining unit.  (JA351.)

The Union's lead negotiator is Business Representative Michael Maddy ("Maddy").  (JA346.)  Starting November 14, 2012, Maddy enlisted the assistance of Attorney John Doll ("Doll").  (JA541.)  The Company's lead negotiator is Human Resources Director Sharon Wille ("Wille"), and she attended all bargaining sessions for all units, except for one session on January 3, 2013.  (JA564-JA566.) Wille has been assisted by other members of management, such as President Charles Shive, Chief Financial Officer Paul McNiel, and Vice President of Sales Phil Kazer ("Kazer").  (JA564, JA585, JA599.)

Due in large part to the Union's unavailability and cancelling of meetings, the parties met relatively few times prior to the expiration of the labor agreements. (JA212, JA561-JA563, JA587, JA596.)  Wille requested to begin negotiations in August 2012, but Maddy was not available until September 2012.  (JA080; JA082; JA212;  JA458-JA459,  JA561-JA563.)    Wille  scheduled  several  bargaining sessions with the Union in advance, including two sessions on October 17th and 31st that the Union later cancelled.  (JA563.)  Maddy testified that, at some unknown point in time, Mike-sell's indicated that it would be preferable to meet on Wednesdays.  (JA521-JA522.)  Wille confirmed that she asked to meet "at least every Wednesday."  (JA563.)

The most contentious negotiations have been with the route sales drivers, which comprise the largest portion of both bargaining units.  (JA567.)  The OTR drivers and warehouse workers chose to defer to the route sales drivers to pave the way on the key issues of pensions and healthcare.  (JA412, JA437, JA462-JA464, JA478, JA566-JA567.)  By November 19, 2012, the parties reached a tentative agreement on discrete issues for warehouse and OTR employees, but they remained deadlocked on healthcare and pension for all employees, and on commissions for the route sales drivers.  (JA566-JA567, JA609-JA611; JA220.) Negotiations for all three groups proceeded in a similar manner, but the route sales drivers are at the crux of the impasse for both units on the issues of healthcare and pensions, so the route sales negotiations are the main focus in this case.

The pre-expiration route sales negotiations were held on October 10th and 24th, and November 14th.  (JA460, JA564.)  The pre-expiration meetings for OTR drivers occurred on October 12th and 29th, and November 5th.  (JA462, JA566.) The pre-expiration meetings for the warehouse unit were held on September 12th, and October 3rd, 23rd, 25th, and 26th.  (JA463, JA565.)  The parties also met for warehouse negotiations on November 13th and 15th, after the warehouse labor agreement expired but before Mike-sell's implemented its Final Offers.  (JA464, JA565-JA566.)

### III.   The Company's Financial Condition

At the outset and throughout negotiations, Mike-sell's talked with each of the Union's bargaining units about the Company's continuing financial struggle. (JA352, JA369, JA418, JA470-JA472, JA587; JA217.)   Mike-sell's shared the reasons for its ongoing losses, including the poor economy, the sharp rise in costs for materials, the continuing decline in overall sales, the stiff increase in competition, and the recent loss of major accounts (*e.g.,* Mission Food).  (JA354-JA355, JA358-JA359, JA369, JA392, JA418, JA473-475, JA556, JA584, JA587-589; JA217, JA084.)  Mike-sell's disclosed complete financial information to the Union, which reflected that the Company had lost almost $5.5 million in just over four years.  (JA369-370, JA390-JA391, JA418, JA555; JA217.)  These mounting financial losses forced Mike-sell's, in 2012, to convert its sales territories in Columbus, Cincinnati, and Sabina from Company routes to independent distributorships.  (JA385-JA386, JA475.)  The closure of these distribution centers resulted in the permanent layoff of about 30 route sales drivers.  (JA385-JA386, JA475.)  Mike-sell's also shared comparative industry data from the local area, which showed other employers paying wages and benefits significantly lower than those paid by the Company.  (JA359-JA360, JA393, JA419-JA420, JA423, JA589-JA591.)  Mike-sell's further emphasized the skyrocketing healthcare and pension costs and the debilitating effect that they were having on the Company.  (JA352-

JA353, JA358-JA360, JA393-JA394, JA420; JA089, JA117.)  Mike-sell's invited the Union to brainstorm about cost-cutting measures in these key areas, as well as to propose other strategies to help the Company regain a competitive position and become profitable.  (JA370, JA481-JA482, JA584-JA585.)

## IV.     The Three Key Issues

Throughout negotiations, the Company's focus has always been on three key areas:  commissions, healthcare, and pensions.  (JA567.)  Certain concessions / restructurings in these areas were absolutely necessary for Mike-sell's to remain a viable and profitable competitor.  (JA567-JA583.)

### A.     Commissions

Mike-sell's needed a change in commission structure for the route sales drivers from a basis of gross sales to net sales.  (JA492-JA494; JA101, at JA102.) Such a change in commission structure was the only feasible way for Mike-sell's to be able to increase sales volume and realize a profit.[1]  (JA415-JA416, JA425, JA492-JA493, JA574-JA579.)  Specifically, Mike-sell's needed to increase the perceived "discount" to consumers so the Company could be competitive with the

---

[1] Another way to cut manufacturing costs would be to reduce the amount of potato chips / snacks in each bag.  (JA492-JA493, JA581.)  But consumers are more savvy these days, and they notice when companies reduce product volume, especially given that stores now print a breakdown of unit price (per ounce or gram) on the shelf.  (JA581-JA582.)

perceived "discount" provided by Frito-Lay.[2]    (JA578-JA579, JA727.)    The

Company therefore designed a new "net" commission structure that would be more

favorable for the Company by allowing it to price / promote its product more

_____

[2] To understand the difference between "net" sales versus "gross" sales, one must understand three price points in the snack food industry: the bag price, the shelf price, and the retailer price. (JA574-JA576.) The "bag price" is the price printed on the top corner of any bag of potato chips / snacks; the manufacturer sets this "gross" price with full knowledge that consumers will almost never pay it. (JA574-JA577, JA728, JA731-JA732.) The "shelf price" is the price displayed on the store shelf for the sale of the potato chips / snacks; it is the price the consumer actually pays the store for the product. (JA574-JA575.) The "retailer price" is the price the retailer pays to the manufacturer for the potato chips / snacks; it is the amount the Company actually receives from the store for its products. (JA575.) Because it is forced to compete with industry giants like Frito-Lay, Mike-sell's has little control of the retailer price and even less control of the shelf price—which continues to climb. (JA577-JA578.) If the Company attempts to increase the retailer price or decrease the shelf price, then the store will simply stop buying Mike-sell's products and sell more Frito-Lay instead. (JA577-JA578.) The only price point over which Mike-sell's has full control is the bag price. (JA578-JA579.) If the Company can raise the bag price so as to create a bigger gap from the store's shelf price, then consumers will perceive a bigger "discount" and will buy more Mike-sell's products. (JA578-JA579.) Frito-Lay and other industry competitors have manipulated these price points for years, and in order to keep up, Mike-sell's needs to do the same. (JA576-JA577, JA579-JA580.) But, Mike-sell's cannot hike the bag price if it continues to pay route sales commissions based on "gross sales," which means commissions based on the fictional bag price that the consumer never pays and the Company never receives. (JA576, JA578.) If Mike-sell's continued paying commissions based on gross sales, then the additional revenue made from increased sales volume would be lost to higher route sales commissions. (JA580.) Mike-sell's instead needs to pay route sales commissions based on "net sales," which means commissions based on the retailer price that is actually paid to the Company for its products. (JA579.) In this way, Mike-sell's can increase its sales volume while still paying route sales drivers a fair commission based on the Company's actual revenue, and the route sales drivers do not suffer a wage decrease because the lower price base for commissions is offset by an increase in sales. (JA579, JA582-JA583, JA668; JA180.)

- 9 -

competitively while at the same time increasing commissions for the route sales drivers through higher overall sales volume.

### B.    Healthcare

Like many employers, Mike-sell's is concerned about the unpredictability of the Affordable Care Act.  (JA368, JA454, JA479, JA570-JA573, JA723-JA726.) The Company therefore bargained for greater flexibility with regard to healthcare for bargaining unit employees.  (JA570-JA574, JA729-JA730.)  Mike-sell's also needed to eliminate retiree coverage, which was a huge expense.  (JA367, JA500-JA501, JA638-JA639; JA101, at JA114.)

### C.    Pensions

It is vital for Mike-sell's to get relief from the Union's seriously underfunded pension plan.  (JA425, JA567-JA569, JA671.)  The Central States Pension Fund ("Fund") is approximately 48% underfunded.   (JA567, JA671.) Many participating employers are going bankrupt, whereas others who can afford to pay a significant withdrawal penalty are withdrawing from the Fund altogether. (JA567-JA568, JA672.)  Employers are racing to withdraw from the Fund because the last employer standing will be stuck with the tab.  (JA678-JA679.)  At the same time, the retiree pool is growing rapidly.  (JA567-JA568.)   For every active employee in the Fund, there are four retirees receiving benefits.  (JA567, JA671.) This "perfect storm" has led pension contribution rates and administrative costs to

skyrocket, costing almost $170.00 per week, per employee at the time of hearing. (JA568, JA591, JA671-JA672.)  Pension costs were expected to rise up to 8% per year for the next five years.  (JA568-JA569, JA672.)  Unfortunately, Mike-sell's could not afford to pay the penalty to withdraw from the Fund, which would cost almost $20 million.  (JA568, JA672.)

## V.      The October 10th Bargaining Session  (*See* JA255, at JA258)

Mike-sell's presented its initial route sales proposal on October 10th. (JA388, JA477-JA478; JA101.)   On commissions, Mike-sell's proposed that drivers be paid on net sales at the rates of 13% for manufactured products, 9% for non-manufactured products, 7% for private-label products, and 3% for chocolates. (JA101, at JA102-JA103.)  On healthcare, Mike-sell's proposed that employees be entitled to participate in any insurance plan(s) offered on the same terms and conditions as are provided to nonunion employees, except that retiree insurance would be permanently discontinued.  (JA500, JA570-JA574; JA101, at JA114.) On pensions, Mike-sell's proposed that employees pay 50% of current pension contributions, plus 100% of any future pension cost increases.[3]  (JA624-JA625; JA101, at JA114-JA115.)  Mike-sell's emphasized that it had no interest in re-negotiating the expiring labor agreement, so its proposals were instead contained in

---

[3] After learning that the Fund does not permit direct employee contributions, Mike-sell's revised its proposal to ask that employees reimburse the Company for the increased pension costs.  (JA497-JA498.)

- 11 -

a new proposed contract. (JA387, JA388-JA389, JA476, JA586; JA101.) The Company provided a summary overview of its package proposal, but the Union needed to review the entire proposal in full, given that it was an entirely new document. (JA388, JA477-JA478; JA099.)

The Union then presented its initial proposal at the October 10th meeting. (JA370-JA384; JA093.) Although aware of the Company's financial woes, the Union only made proposals that would cost more money; there were no savings in any of the proposals that would help Mike-sell's regain profitability. (JA372-JA384, JA585; JA093.) On commissions, the Union proposed (1) either (a) moving to a base-plus-commission structure, or (b) increasing the commission rate for all products to 15%; *and* (2) increasing the daily and weekly rates paid for route riding from $90.00 to $130.00 and from $450.00 to $650.00, respectively. (JA372-JA374, JA627; JA093.) On healthcare, the Union proposed moving employees and retirees to the Central States Health and Welfare Plan ("Plan"), a preferred provider plan that would result in a 21% cost increase. (JA426-JA427, JA569-JA572, JA634, JA668-JA670; JA093, at JA097.) On pensions, the Union proposed to maintain the same terms with Mike-sell's paying the full pension contributions, plus all cost increases. (JA640; JA093, at JA097-JA098.)

At the end of the meeting, Mike-sell's inquired as to the actual cost of the Union's proposals. (JA591-JA592.) The Union was unable to provide an answer,

as no cost analysis had been conducted. (JA481, JA591-JA592.) Mike-sell's responded that it had no money to fund the Union's proposals. (JA386-JA387, JA480, JA483, JA591.) Wille also informed the Union that the labor agreement was expiring on November 17th and would not be extended. (JA586.)

## VI. The October 24th Bargaining Session  (*See* JA255, at JA285)

When the parties met on October 24th, rather than discussing their respective proposals, the Union's first order of business was to negotiate severance packages for laid-off drivers. (JA592.) The Union later indicated that it was not interested in the Company's proposals on the key issues of commissions, healthcare, and pensions. (JA484-JA486, JA492; JA099.) The Union made no movement toward accepting net commissions, despite the fact that Mike-sell's had explained its importance. (JA425, JA484-JA485, JA592-JA594; JA099.) On healthcare, the Union still insisted that Mike-sell's join its Plan and maintain retiree coverage, but the Union wanted to postpone further healthcare discussions until after it had a Plan representative give a presentation to the Company.[4] In response to the Company's continuing request for pension relief, the Union flippantly suggested that Mike-sell's pay the $20 million withdrawal penalty. (JA421, JA425, JA497.) Overall, the Union simply responded that the Company's proposals were "hard to accept." (JA484-JA485, JA592-JA594; JA099.)

---

[4] The Union made no Plan presentation until November 13, 2012, four days before the route sales labor agreement expired. (JA593, JA601.)

Neither party made any movement on the three key issues, although Mike-sell's did agree to three of the Union's language changes.  (JA594-JA595.)  The bargaining session ended with Maddy stating that the parties were "worlds apart;" that the Union would be bringing in its attorney; and that the Union needed to cancel the next session that had been scheduled for October 31st.  (JA417, JA461, JA595-JA596, JA682-JA683.)  Maddy said he would get back to Wille with a new date to meet, and he rejected Wille's suggestion to involve a federal mediator.  (JA417, JA461, JA490, JA682-JA683.)  Wille reminded Maddy that "[the parties were] 24 days away from the end of this contract."  (JA596.)

## VII.  The Company's Ongoing Efforts To Facilitate Negotiations

Wille heard nothing from Maddy about any new date to meet.  Because of the lack of meetings and the impending expiration of the route sales labor agreement, Wille wrote Maddy on November 2, 2012, offering to schedule additional meetings, suggesting several available dates to bargain, and again requesting to involve a federal mediator.  (JA487-JA489, JA607-JA609; JA144; JA219.)  It was not until November 14th—three days before the route sales labor agreement expired—that the Union was willing to meet.  (JA608-JA609.)

## VIII.  The November 14th Bargaining Session  (*See* JA255, at JA296)

At the third route sales session, the Union withdrew several of its proposals.  (JA428-JA431; JA336, at JA336-JA338.)  Mike-sell's again shared its financial

condition, explained the impact of gross sales versus net sales, reviewed industry trends of deferring pension increases, and discussed rising healthcare costs. (JA598-JA599.)  The parties reviewed the few items on which they had reached agreement, and then the Union raised four new issues for the first time, which only added to the open issues on the table.  (JA597-JA598; JA336, at JA339.)

The Union offered a one-year extension of the expiring labor agreement, but Mike-sell's could not agree to any contract or extension without key changes to commissions, pensions, and healthcare.  (JA422, JA424, JA425, JA502-JA503, JA529, JA597-JA598, JA688-JA689.)  Mike-sell's stood firm on its original healthcare proposal from October 10th, but it did make a couple significant revisions to its commissions and pension proposals.  (JA498-JA499, JA536-JA537.)  Specifically, Mike-sell's proposed (1) to accept a small increase in commission rates (but still less than the Union wanted) if the Union moved to net sales and if the drivers increased their individual sales by 3% during the first year of the contract and maintained that increase thereafter; and (2) to require employees only to pay the pension increases (not also half of the entire pension contribution).  (JA496, JA535-JA536, JA721-JA722; JA255, at JA296-JA297; JA147, at JA162; JA182, at JA186.)  Although the Union eventually agreed to entertain the concept of net sales commissions, the Union proposed commission rates that were far too high and not conditioned on an increase in sales volume.

(JA495-JA496, JA517-JA518, JA535-JA536, JA542, JA599-JA600, JA602-JA604, JA689-JA690.)   Ultimately, the Company's proposals on all three key issues were rejected, and the Union wanted to postpone healthcare discussions until it could get composite numbers from its Plan.  (JA432-JA433, JA502-JA503, JA604-JA605, JA618, JA673-674, JA680; JA255, at JA296-JA297.)

Maddy stated that he saw "no point" in taking the Company's proposal to the membership and that the parties were "just spinning their wheels."  (JA597.) Doll similarly admitted that the parties "didn't move the ball very far today."  (JA-434, JA538, JA605-JA606.)   Kazer partially disagreed with Doll, clarifying "*we* have made the progress; *you* have done nothing."[5]   (JA606, JA698-JA699 (verbal emphasis and gesturing in original).)   Mike-sell's offered to meet again on November 16th—or any other date before the labor agreement expired—but the Union declined to schedule another session at that time.  (JA434-JA435, JA600-JA601, JA613, JA693.)  The meeting ended with Maddy and Doll saying that they would get back to the Company later.  (JA434-JA435, JA504, JA540-JA541, JA601.)   Wille stated that Mike-sell's would ***not*** extend the expiring labor

---

[5] The pronoun "we" referenced Mike-sell's, whereas the pronoun "you" referenced the Union.  (JA698-JA699.)

agreement and instructed the Union to vote on the Company's proposal.[6]  (JA538, JA600-601, JA612-JA613, JA693; JA255, at JA301.)

## IX.    Impasse And Implementation

As of November 16, 2012—the day before the labor agreement was set to expire—the Union still had not gotten back to Mike-sell's with its availability. (JA608-JA610, JA613.)   It appeared there had been a genuine exhaustion of productive discussions, and neither party had indicated a willingness to compromise any further on the three key issues.  (JA609-JA613.)  Therefore, on November 16th, Wille hand-delivered a letter to Maddy.  (JA438-JA441, JA505-JA506, JA613-JA614; JA220; JA146; JA147; JA164.)   The letter confirmed that the Union had thus far refused to meet and emphasized that Mike-sell's would not extend the labor agreement.  (JA220.)   The letter also reiterated the Company's previous request for the Union to vote on its November 14th proposal, which was the Company's "full and final offer."  (JA613-JA614; JA220.)  The letter enclosed

_____

[6] Maddy claims that he "do[es] not recall" Mike-sell's asking the Union to take a vote, and he "do[es] not recall" Wille stating that Mike-sell's would not extend the labor agreement, although he does recall some reference to the labor agreement's looming expiration date.  (JA436, JA486-JA487, JA505.)   Maddy's lack of memory is insufficient to rebut Wille's testimony and business records of what Mike-sell's conveyed at the end of the November 14th meeting.

copies of the Company's Final Offers for the Union's reference.[7] (JA613-JA614; JA220.) Maddy scanned the letter and hastily replied to Wille that the Union would not be available to meet prior to the expiration of the labor agreement. (JA613.) Maddy also said that he would contact the Union's attorney. (JA614.)

Mike-sell's heard nothing from the Union in response to the November 16th letter. (JA614-JA615.) The Company knew that it was unwilling to move any further on its commissions, pension, and healthcare proposals. (JA611.) The Union had not budged on its pension proposal, and while its healthcare proposal had fluctuated "all over the map," it never included a feasible rate or the elimination of retiree coverage. (JA609-JA613, JA634; JA336.) Finally, while the Union had agreed to consider commissions based on net sales, it wanted to set the commission rates too high, and it had not accepted the condition of a sales increase. (JA610; JA336.)

On November 18, 2012, Mike-sell's wrote another letter, which was faxed, emailed, and sent certified mail to the Union. (JA506-JA508, JA615; JA254; JA334.) The November 18th letter stated that the labor agreement had expired; that no vote had been taken by the Union; that an impasse existed in both

---

[7] The warehouse and OTR employees had deferred to the route sales drivers for healthcare and pensions, so the parties' lack of agreement on those issues affected all employees. (JA412, JA437, JA462-JA464, JA478, JA566-JA567.) Thus, the Company extended a "full and final offer" to both bargaining units.

bargaining units;[8] and that Mike-sell's intended to implement its Final Offers effective November 19, 2012.  (JA616; JA254.)  Wille called Maddy several times over the weekend to discuss the matter, but she had to leave a voicemail each time.  (JA617, JA714.)  Mike-sell's ultimately implemented both Final Offers on November 19th, which included the Company's last, best proposal on all issues, as well as any tentative agreements that had been reached by the parties.  (JA617-JA619.)  Mike-sell's did not implement any terms that had not been previously discussed at the bargaining table.  (JA680.)

Maddy eventually called Wille on November 19th, but he still provided no bargaining dates, nor did he indicate that there was movement to be made on the key issues.  (JA617.)  In fact, after this brief discussion, Mike-sell's heard absolutely nothing at all from the Union until November 26th, when the Union proposed to meet on December 5, 2013.[9]  (JA434-JA435, JA618.)

---

[8] Because the parties were at impasse for route drivers on the issues of healthcare and pensions, they were equally at impasse for the warehouse and OTR employees.

[9] The Union thereafter filed its unfair labor practice charge on November 30, 2012, which led to the procedural history in this case.

## X.     Post-Implementation Bargaining Sessions[10]

As of the hearing in this matter, the parties had met six times since implementation of the Company's Final Offers:  December 5 and 7, 2012; January 3 and 22, 2013; February 13 and 27, 2013; and March 20, 2013.  (JA509.)  None of the three key issues were settled during these post-implementation bargaining sessions.  (JA621.)  The parties have settled some issues, and as agreements were reached, Mike-sell's has acted in good faith to incorporate them into the implemented terms.  (JA621-JA623, JA641; JA192.)  But, as soon as the parties made some progress, the Union would raise new issues for the first time or reinstate old proposals that had previously been withdrawn.  (JA620-JA621, JA629-JA630; JA336.)  The Union's strategy essentially resulted in the parties taking one step forward and two steps back at each bargaining session.

On December 5th, the parties settled 14 issues.  (JA192, at JA195, JA198-JA202.)  But then the Union raised several new issues for the first time (including 16 separate "job protection or security" issues), despite the fact that the Company's proposal to change or omit those protections had been on the table since October

---

[10]  Mike-sell's raised a blanket objection to all evidence of post-implementation bargaining, but the ALJ overruled that objection.  (JA751.)  The ALJ instead selectively admitted certain post-implementation evidence, while excluding other post-implementation evidence all together.  Mike-sell's contends that the ALJ erred in admitting the post-implementation evidence.  Moreover, if post-implementation evidence is considered, it must be properly analyzed to determine whether the parties reached (another) impasse some time later.

10th.[11]     (JA447-JA455,  JA513-JA515,  JA543-JA544,  JA545-JA550,  JA551,

JA626; JA336, at JA339.)  The parties came no closer to reaching an agreement on

healthcare or pension; the Company's position on these issues had not changed,

and the Union's proposed changes were unacceptable.  (JA455, JA498-JA499,

JA628, JA635-JA636, JA638, JA640; JA336, at JA338.)

On December 7th, the parties settled four issues, but then the Union raised

one new issue and reinstated all of its original proposals from October 10th.

(JA626, JA629-JA630, JA634, JA636, JA684-JA685; JA192, at JA197, JA199,

JA207, JA209; JA255, at JA308; JA336.)  As a result, any progress that had been

made on these proposals was lost.  The Union also raised one new issue for the

first time based on language that had been presented by Mike-sell's on October

10th.   The parties came no closer to reaching an agreement on the issues of

healthcare or pension.  (JA455, JA636, JA640.)

On January 3rd, the parties did not reach any agreements, nor did they make

progress on the key issues.  (JA626, JA628; JA336, at JA338.)  But the Union

raised one new issue for the first time based on language presented by Mike-sell's

on October 10th.  (JA336, at JA339.)

---

[11] Maddy admits that he recognized that Mike-sell's was proposing an entirely new
contract and that its initial proposal distributed on October 10th was not based on
the then-current labor agreement.  (JA525-JA527.)   Maddy also admits that he
"looked over" the Company's initial proposal before the October 24th session.
(JA525-JA526.)

On January 22nd, the parties settled six issues, but then the Union raised four more new issues for the first time based on language that had been presented by Mike-sell's on October 10th. (JA626; JA192, at JA194-JA195, JA199, JA206, JA210; JA336, at JA339.) The parties made no progress on the key issues, although the Union made a new but equally untenable healthcare proposal, which would require Mike-sell's to continue its own health plan and pay employees $1,200.00 per month (and retirees $1,000.00 per month) if they chose to opt out of it. (JA628, JA637, JA640, JA710-JA712, JA731.)

On February 13th, the parties settled 11 issues, but then the Union raised one new proposal for the first time based on language that had been presented by Mike-sell's on October 10th. (JA626; JA192, at JA194, JA196-JA198, JA200, JA205; JA336, at JA340.) In addition, the major issues of commissions, healthcare, and pensions were still looming, and Mike-sell's did not budge in its position on those subjects. (JA498-JA499, JA662.) The parties made no progress on the key issues. (JA662.) Kazer informed the Union that there was "nothing left to discuss;" that Mike-sell's had just presented its last, best, and final offer; that Mike-sell's would prepare the offer in written form and present it later that week; and that the Union should vote on it. (JA660-JA662.) After this bargaining session, the Union took a strike vote for both bargaining units. (JA511-JA512.)

On February 27th, the parties did not reach agreement on anything. The Union finally entertained the idea of a sales volume increase as part of the commission plan, but the proposed increase was too low, and it was based on sales of the entire bargaining unit rather than sales of individual drivers. (JA631-JA633; JA336.) The Union then raised four new issues for the first time based on language that had been presented by Mike-sell's on October 10th. (JA626; JA336, at JA340.) The Union also suddenly suggested, for the first time, that it would not honor the tentative agreements reached for the warehouse and OTR employees. (JA-664-JA665.) Mike-sell's did not change its position and repeatedly emphasized that it had already presented its last, best, and final offer on February 13th and the Union should vote on it. (JA663-JA664; JA255, at JA326.)

On March 20th, the parties met for the first time with a federal mediator. (JA509-JA510.) It was the first session since implementation that the Union did not raise new issues. (JA336.) Mike-sell's still did not change its position at all from February 13th. (JA665-JA667.) No progress was made, and the parties left with around 30 open issues—all but three were the Union's alone and had been raised or revived since implementation. (JA641-JA659, JA665-JA667; JA336.)

## SUMMARY OF THE ARGUMENT

The Board erred by affirming the ALJ's Decision that Mike-sell's violated Sections 8(a)(1) and 8(a)(5) and committed an unfair labor practice by unilaterally

implementing its Final Offers.  The ALJ ultimately concluded that an impasse did not exist.  However, the record as a whole contains substantial evidence that the parties *were* at impasse on November 19, 2012, which means that Mike-sell's was privileged to implement its Final Offers for both bargaining units.  The parties were deadlocked on the three key issues of commissions, healthcare, and pensions at the time the route sales labor agreement expired.  The mere fact that the Union made some movement on its commissions proposal during the parties' last pre-implementation bargaining session does not mean that no valid impasse existed on November 19th, after both parties refused to move any further and the Union provided no potential dates to resume bargaining.

The ALJ ignored the Union's motives and dilatory behavior throughout the route sales bargaining process.  This evidence ignored by the ALJ is the same critical evidence that reveals the truth in this case:  As of November 19th, the parties were deadlocked on three key issues, and the Union sought to avoid the appearance of impasse by delaying negotiations and "stonewalling" the Company. The Union attempted to avoid impasse by simply not meeting with Mike-sell's and postponing discussion of key issues, hoping to delay the bargaining process and extend the labor agreements for its benefit.  The Union also flatly refused the Company's request to take its Final Offers to a vote.  The Union's strategy of

inaction only serves to highlight the fact that an impasse existed on the three key economic issues when Mike-sell's implemented its Final Offers.

The ALJ improperly admitted evidence of the parties' post-implementation bargaining sessions. The parties' post-implementation bargaining sessions are irrelevant to whether an impasse existed on November 19th. The mere fact that negotiations continue does not mean that an impasse does not exist. If post-implementation bargaining concessions were probative of whether an impasse existed, then a union would always be able to invalidate an employer's unilateral implementation by waiting until after implementation to make movement on key issues. Instead, the Union's post-implementation concessions support a finding of an impasse on November 19th and further demonstrate that, since impasse and implementation, the Union has tried desperately to show movement (however superficial) between the parties to support its unfair labor practice charges.

Not only did the ALJ improperly admit evidence of post-implementation bargaining, but he further failed to properly analyze that evidence. The post-implementation evidence, for example, sheds further light on the Union's bad behavior. The post-implementation evidence also reveals the parties' second bargaining impasse, which cuts off the Company's liability (if any) in this case. That is, even if the parties somehow were not at impasse on November 19th (which they were), it is clear that the parties did reach impasse on February 13, 2013.

When all of the relevant evidence is properly considered, it is clear that the record as a whole does <u>not</u> contain substantial evidence to support the ALJ's credibility assessments, factual findings, conclusions of law, remedy, and order. Accordingly, the Company's Petition for Review should be granted, the General Counsel's Petition for Enforcement should be denied, and the Board's Order should be reversed.

## STANDING

Pursuant to D.C. Circuit Rule 28(a)(7), Mike-sell's has standing to file this appeal by virtue of the fact that it was named as the Respondent in an unfair labor practice charge filed by the Union. The Union's charge alleged that the Company violated Sections 8(a)(1) and 8(a)(5) of the NLRA. On January 15, 2014, the Board issued an Order reported at 360 NLRB No. 28 in Board Case No. 09-CA-094143, upholding the ALJ Decision issued on June 18, 2013. Mike-sell's is directly and adversely affected by the Board's Order, which requires monetary and injunctive relief. Thus, the Company has standing to seek review of the Order.

## STANDARD OF REVIEW

The Board's Order cannot be upheld and enforced unless substantial evidence in the record as a whole supports its factual findings and its conclusions have a reasonable basis in the law. *See, e.g., TruServ Corp. v. NLRB,* 254 F.3d 1105, 1115 (D.C. Cir. July 6, 2001). In undertaking a substantial evidence review,

the Court must consider "not just the evidence that supports the Board's decision, but any evidence in the record that 'fairly detracts from its weight.'" *See, e.g., Thomas v. NLRB,* 213 F.3d 651, 657 (D.C. Cir. June 9, 2000) (internal citations omitted). When reviewing the Board's findings as to an employer's motivations, "an unlawful purpose is not to be lightly inferred," as federal courts have recognized that mere "[s]uspicion, conjecture, and theoretical speculation register no weight on the substantial evidence scale." *TRW, Inc. v. NLRB*, 654 F.2d 307, 312 (5th Cir. Aug. 24, 1981); *see also Eastern Omni Constructors, Inc. v. NLRB*, 170 F.3d 418, 427 (4th Cir. March 9, 1999). Thus, the Board's Order cannot stand unless it is supported by objective evidence in the record that substantially confirms the Board's findings.

## ARGUMENT

This case turns on whether the parties were at impasse on November 19, 2012. In answering this question, the Board was required to consider all of the documentary evidence and testimony in the record. *TruServ,* 254 F.3d at 1114. The ALJ repeatedly concluded that an impasse did not exist. However, in several instances, the ALJ made improper assumptions of fact, took evidence out of context, relied on improperly-admitted evidence, and failed to consider undisputed evidence that conflicted with his findings and conclusions. This kind of "selective analysis" is improper, especially where the inferences drawn from ignoring certain

evidence are contrary to direct, unrebutted testimony.  *See, e.g., NLRB v. Cutting, Inc.,* 701 F.2d 659, 665-69 (7th Cir. March 2, 1983).  Here, the evidence ignored by the ALJ is the same evidence that reveals the truth in this case:  As of November 19th, the parties were deadlocked on the three key issues, and the Union sought to avoid the appearance of impasse by delaying negotiations and "stonewalling" the Company.

Based on these considerations, explained below in detail, the Company's Petition for Review should be granted, the General Counsel's Petition for Enforcement should be denied, and the Board's Order should be reversed because: (I) the record as a whole contains substantial evidence that the parties *were* at impasse on November 19th; and (II) the ALJ erred in admitting evidence about post-implementation bargaining (which only serves to cut off the Company's liability, if any).  As a result, the record as a whole does not contain substantial evidence to support the ALJ's credibility assessments, factual findings, conclusions of law, remedy, and order.

## I.     The Record Shows That The Parties Were At Impasse On November 19th, So The Board's Order Is Not Supported By Substantial Evidence.

When parties reach a bargaining impasse, the employer is privileged to implement its last, best, and final offer.  *See, e.g., Laurel Bay Health & Rehab. Ctr. v. NLRB,* 666 F.3d 1365, 1373 (D.C. Cir. Jan. 20, 2012); *TruServ,* 254 F.3d at 1114.  But there is no fixed definition of "impasse," which can be an elusive

concept.  Among the factors considered in evaluating the existence of an impasse are "the bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, [and] the contemporaneous understanding of the parties as to the state of negotiations."  *Laurel Bay,* 666 F.3d at 1373 (internal citations and quotations omitted).  Generally, an impasse is said to exist when the parties are deadlocked in negotiations and further discussions are fruitless in the absence of a change in position.  *Laurel Bay,* 666 F.3d at 1373-74; *TruServ,* 254 F.3d at 1114; *Hi-Way Billboards, Inc.,* 206 NLRB 22, 23 (1973).

Impasse can occur at any time in negotiations; it is not dependent upon a particular number of meetings between the parties.  *See, e.g., Dixon Distribution Co.,* 211 NLRB 241, 244 (1974) (permitting unilateral implementation after only one 20-minute bargaining session).  It is also not dependent on a certain number of issues remaining open, as "[i]mpasse over a single issue may create an overall bargaining impasse that privileges unilateral action if the issue is 'of such overriding importance' that it frustrates the progress of further negotiations." *Laurel Bay,* 666 F.3d at 1374.  Accordingly, "an impasse is no less an impasse because the parties were closer to agreement than previously, and a deadlock is still a deadlock whether produced by one or a number of significant and unresolved differences in positions."  *See, e.g., Taft Broadcasting Co.,* 163 NLRB 475, 478

- 29 -

(1967), enforced sub nom., *Television & Radio Artists v. NLRB*, 395 F.2d 622 (D.C. Cir 1968). In the end, it must appear that there has been a genuine exhaustion of productive discussions and an unwillingness by both parties to compromise any further toward reaching an agreement. *Laurel Bay,* 666 F.3d at 1373-74. Where good faith bargaining has not resolved key issues and there are no definite plans for further sessions to break the deadlock, a finding of impasse is warranted. *See, e.g., Dallas Gen. Drivers, Local No. 745 v. NLRB*, 355 F.2d 842, 845 (D.C. Cir. Jan. 6, 1966).

For example, in *TruServ*, this Court granted an employer's petition for review because the Board had incorrectly concluded that the parties were not at impasse at the time of a unilateral implementation. *TruServ,* 254 F.3d at 1115. Just as in this case, the employer in *TruServ* had "from the outset put the union on notice that it sought to address significant concerns about competitiveness and productivity by substantially modifying the parties' bargaining agreement." *Id.* at 1118. The Court was not persuaded by the Board's reliance on the employer's "abrupt" extension of its last, best, and final offer; the parties' mutual concessions at the last pre-implementation bargaining session; the union's denial of an impasse; or the union's request for additional meetings. *Id.* at 1114-15. The Court also rejected the Board's "intuitive belief" that "each side would have made additional concessions" because "the parties remain in control of their negotiations, and each

- 30 -

party, not the Board, determines at what point it ceases to be willing to compromise." *Id.* at 1116. Furthermore, the union's self-serving conduct—its statement that the parties were not at impasse and its request for additional bargaining sessions—was insufficient to demonstrate a desire to pursue further negotiations. *Id.* at 1117. In finding an impasse, this Court focused on the fact that the union had failed to indicate a willingness to further compromise on any specific issue and the fact that the union had "refused even to submit the company's Final Offer to the unit employees for a vote." *Id.* at 1118.

Again, in *Laurel Bay*, this Court granted an employer's petition for review because the Board had incorrectly concluded that the parties were not at impasse at the time of a unilateral implementation. The parties in *Laurel Bay*, just as the parties here, were "at loggerheads" over benefit fund increases (among other things). *Laurel Bay*, 666 F.3d at 1374. And just as in this case, neither party in *Laurel Bay* budged on its benefits plan position before the employer announced that it had already extended its last, best, and final offer. *Id.* The union's belated statement that it would prepare a counterproposal was insufficient to avoid a finding of impasse on this single issue, as "a party's 'bare assertions of flexibility on open issues and its generalized promises of new proposals [do not clearly establish] any change, much less a substantial change' in that party's negotiation position." *Id.* at 1375. Rather, once impasse was announced, the burden was on

the union to show "changed circumstances" with regard to the particular bargaining subject in question. *Id.* at 1376. Because the union failed to meet its burden, the parties were at impasse over the issue of benefit plan contributions.

Just as in *TruServ* and *Laurel Bay*, the parties in this case were at impasse on November 19th. Mike-sell's was therefore permitted to unilaterally implement changes in the terms and conditions of employment for both bargaining units consistent with its pre-impasse Final Offers. *See, e.g., Laurel Bay,* 666 F.3d at 1373. The ALJ reached the opposite conclusion only because he ignored several critical (and undisputed) facts in the record; improperly relied on irrelevant facts; made improper assumptions of fact; and applied the law of cases that are factually distinguishable from this case.

### A.     The ALJ Failed To Properly Analyze Evidence Pertaining To The Union's Dilatory Motives And Pre-Implementation Delay.

The ALJ's findings related to the Union's behavior are based on his analysis of pre-bargaining communications and pre-implementation bargaining sessions for all three groups of employees (i.e., route sales, OTR drivers, and warehouse workers). (JA750.) It was improper to aggregate and collectively rely on events for all three groups of employees because only the route sales negotiations are relevant to this case. The parties deliberately held separate negotiations for each group of employees, and the OTR and warehouse employees expressly deferred to the route sales drivers on the key issues of pension and healthcare. (JA412, JA437,

JA462-JA464, JA478, JA566-JA567.)   It is therefore irrelevant that the parties began warehouse negotiations in September (JA749); that the parties held 12 bargaining sessions for all three groups combined (JA750); that the parties reached tentative agreements for the warehouse and OTR employees (JA749-JA750); and that Mike-sell's expressed satisfaction with the OTR negotiations (JA749).  The Union only acted in a dilatory fashion with regard to route sales negotiations, as route sales drivers control the ultimate outcome on the three key issues.  Hence, the fact that the Union did not begin bargaining for route sales until October (as opposed to September), and only appeared for three pre-implementation bargaining sessions for route sales (as opposed to 12), carries special significance.

In addition, the ALJ ignored the Union's motives and dilatory behavior throughout the route sales bargaining process.  Just as in *TruServ*, the Union quickly recognized the Company's dire financial straits and its need to cut costs. *TruServ*, 254 F.3d at 1118.  The Union's initial strategy to oppose the Company's efforts to reduce costs was to stall negotiations in an attempt to delay the concessions that would inevitably come with any new labor agreement.  *See, e.g., NLRB v. H & H Pretzel Co.,* 831 F.2d 650, 656 (6th Cir. Oct. 19, 1987) (the union's expressed willingness to continue talks was a mere token offer made for the ulterior purpose of delaying the inevitable unilateral imposition of pay cuts); *see also M & M Contractors*, 262 NLRB 1472, 1472 (1982) ("[w]hen a union . . .

insists on continually avoiding or delaying bargaining, an employer may be justified in implementing unilateral changes"). The Union did not want to reach a new agreement (which would result in concessions), but it also did not want to reach impasse (which would result in an implementation or a lockout). The best way to accomplish both of the Union's objectives was to impede the bargaining process, as shown in the following examples of conduct that were either ignored or given improper weight by the ALJ:

- The Union arrived late and unprepared to sessions (JA662-JA663);

- The Union cancelled two previously scheduled sessions (JA563, JA610);

- The Union took frequent and long breaks (JA599; JA255, at JA295);

- The Union wasted valuable time to address unrelated issues (JA592);

- The Union declined to discuss healthcare until a Plan representative made a presentation on November 13th (JA593, JA601);

- The Union refused to meet until November 14th after cancelling the session on October 31st, despite receiving the November 2nd letter (JA487-JA489, JA607-JA609; JA144; JA219);

- The Union provided no substantive response to the Company's October 10th proposal until November 14th (JA484-JA485, JA592-JA594; JA099);

- The Union indicated on November 14th (even after the November 13th Plan presentation) that it would have to wait for composite numbers from the Plan

before further responding to the Company's healthcare proposal (JA688; JA255, at JA2972);

- The Union twice refused the Company's request to engage the help of a federal mediator (JA417, JA488, JA490-JA491; JA144; JA219);

- The Union failed to respond in any manner to the Company's correspondence of November 16th and 18th until after implementation (JA563, JA609-JA617; JA219); and

- The Union did not respond to the Company's repeated requests for bargaining availability until November 26th—a week after implementation—when the Union finally proposed to schedule a bargaining session for December 5th.  (JA434-JA435, JA563, JA617-JA618; JA219.)

In short, the Union sought to avoid an agreement by simply not meeting with Mike-sell's and postponing discussion of the key issues, thereby hoping to delay the bargaining process and extend the expiring labor agreements.  These delay tactics support a finding of impasse and justify the Company's implementation. *H & H Pretzel,* 831 F.2d 650, 656; *M & M Contractors*, 262 NLRB at 1472.  Had the ALJ properly considered these critical and undisputed facts pertaining to the Union's pre-implementation conduct, he would have concluded that the Union did indeed act in a dilatory fashion that contributed to the impasse on November 19th.

**B.    The ALJ Made Improper Assumptions Of Fact, Applied Distinguishable Caselaw, And Considered Irrelevant Facts In Determining That No Impasse Existed.**

The ALJ relied on the fact that Mike-sell's "repeatedly declared its intention to move on from the expiring contracts" to support his finding that no impasse existed and that the Company had merely established an "artificial" or "arbitrary" deadline for negotiations.  (JA750.)  The ALJ cites *Newcor Bay City Division*, 345 NLRB 1229, 1240 (2005),  and *CBC Industries*, 311 NLRB 123, 127 (1993),  to support his finding of no impasse, but these cases are easily distinguishable.

In *Newcor*, the employer expressly announced that the contract expiration date was the "deadline" for signing a new contract and, unlike Mike-sell's, did not seek the help of a federal mediator.  *Newcor*, 345 NLRB 1229, 1234, 1239-40. The *Newcor* union never delayed negotiations by cancelling sessions or instigating a bargaining "hiatus," although the employer had cancelled a meeting. *Id.* at 1241. On the day before the contract expired, the employer broke off negotiations at 7:00 p.m. and announced impasse, despite the fact that the parties historically bargained until at least midnight.  *Id.* at 1235-36.  The union requested to continue bargaining into the night and expressly emphasized that it was willing to further compromise on any subject—specifically healthcare and wages—but that it needed additional information to meaningfully analyze the employer's proposals.  *Id.* at 1234-35, 1238.  The employer refused to continue bargaining and instead implemented its

final offer the next day without responding to the union's information request.  *Id.* at 1234-36, 1239-42.

In *CBC Industries*, the employer never explained that economic necessity required greater speed in negotiations, never announced that the parties had reached an impasse or deadlock, never identified any proposal as its "last, best, and final offer," and never informed the union of its intent to unilaterally implement any terms before doing so when the contract expired.  *Id.* at 127.  In fact, the parties met regularly, exchanged proposals and counter offers, and reached tentative agreement on several key economic aspects of the new contract, including a wage freeze and discontinuation of the Christmas bonus.  *Id.* at 124, 127. Accordingly, the record was "devoid of any objective evidence of a failure of the bargaining process to work as intended to narrow differences between the parties" and "devoid of any evidence that either party . . . regarded the process as taking too long, at deadlock, at impasse or that any party expressed unhappiness with the pace or progress of bargaining."  *Id.* at 127.

This case presents far different facts than those in *Newcor* and *CBC Industries*.  From the outset of negotiations, Mike-sell's voluntarily took initiative to provide the Union with a great deal of financial data to support its concessionary proposals.  (JA352-JA355, JA358-JA360, JA369-JA370, JA390-JA394, JA418-JA420, JA423, JA470-JA475, JA481-JA482, JA555-JA556, JA584-JA585, JA587-

JA591; JA217; JA084; JA089; JA117.)  The Union took this financial data at "face value" and did not ask for additional information.  (JA472.)  Mike-sell's tried unsuccessfully to schedule additional bargaining sessions and twice attempted to enlist the help of a federal mediator, whereas the Union cancelled at least two meetings, delayed in providing dates for bargaining, and twice refused to participate in mediation.  (JA417, JA434-JA435, JA487-JA491, JA563, JA607-JA609, JA617-JA618; JA144; JA219.)  At the last pre-implementation bargaining session, the Union ended the meeting by admitting that the parties had not "moved the ball very far" and declined to provide any more dates until some unidentified point in the future (which did not occur until almost two weeks later on November 26th).  (JA434-JA435, JA538, JA563, JA605-JA606, JA617-JA618, JA698-JA699; JA219.)  Perhaps most important, unlike in *Newcor* and *CBC Industries*, the Union neither stated nor implied that it was willing to further compromise its position, and the parties had not reached tentative agreements on any of the three key economic issues.  (JA609-JA613.)  *TruServ,* 254 F.3d at 1117-18.  Accordingly, the ALJ's reliance on *Newcor* and *CBC Industries* is misplaced.

Moreover, while Mike-sell's did emphasize its unwillingness to extend the route sales contract, contrary to the ALJ's finding based on *Newcor*, this announcement did not equate to an "artificial" or "arbitrary" deadline for negotiations.  (JA750.)  The Company never stated nor implied any particular

course of action beyond its general unwillingness to extend the terms of the expired agreement, as it was impossible to do so. Mike-sell's understood that the parties might not reach an agreement by the time the route sales contract expired. In such case, the Company's options would depend on whether the parties were at impasse. If the parties were not at impasse, then Mike-sell's would be required to continue to tolerate the Union's delay tactics. If the parties were at impasse, then Mike-sell's would be prepared for an implementation or a lockout. The ALJ's Decision reflects an improper assumption of fact that, from the very beginning, Mike-sell's intended to implement whatever offer it had on the table when the route sales agreement expired, regardless of the existence or absence of an impasse. This improper assumption of fact contributed to the ALJ's incorrect conclusions of law.

The ALJ also improperly relied on the irrelevant fact that "on November 14, both parties were willing to schedule additional meetings to continue working towards an agreement." (JA750.) Although each party may have announced an intent to comply with its legal obligation to continue negotiations, neither party gave any indication that it was willing to actually change its substantive bargaining stance on any of the key issues. (Indeed, the evidence is to the contrary.) It was improper for the ALJ to assume that Mike-sell's had reason to be optimistic about breaking the deadlock based merely on each party's offer to continue bargaining,

as there was nothing "magical" or "promising" about such an offer; a willingness to bargain is simply required by federal law. *See Laurel Bay,* 666 F.3d at 1375. Mike-sell's was anxious to have as many meetings as possible before the route sales labor agreement expired because the Company actually wanted to reach an agreement rather than being forced to resort to a lockout or implementation. The Union, on the other hand, was obviously quite content to prolong negotiations, given the Company's concessionary proposals. The parties' respective motives are amply demonstrated by the Company's repeated suggestion of specific dates for bargaining and the Union's repeated delay in providing available dates and in cancelling dates. (JA434-JA435, JA563, JA608-JA610, JA613-JA615, JA618; JA219; JA220.) Accordingly, the parties' willingness to continue bargaining as of November 14th was a legal obligation that had little to do with whether the parties were at impasse when Mike-sell's implemented its Final Offers.

In addition, based on *Grinnell Fire Protection Sys. Co.,* 328 NLRB 585, 586 (1999), the ALJ improperly assumed that, when the Union agreed to a net sales commission concept on November 14th, the Union "opened the door to possible compromises on other issues." (JA750.) This finding is unwarranted, particularly in light of the Union's failure to respond with available dates for bargaining. In *Grinnell*, the union not only expressly declared an intent to remain "flexible" during the final bargaining session, but the union also repeatedly emphasized that

its most recent offer was not its last; proposed significant economic concessions and asked where additional concessions were needed before the final meeting ended; followed up with the employer the very same day that the final meeting ended, asking to meet again the next day; and urged the parties to engage a federal mediator. *Id.* at 585-86, 594-95, 598-99.  However, the employer refused to mediate and "broke off bargaining . . . without testing [the union's] stated willingness to make even more concessions . . . ." *Id.* at 586.

This case stands in stark contrast to *Grinnell*.  Although the Union did agree to entertain the concept of net commissions on November 14th, the Union proposed commission rates that were too high and that were not conditioned on a sales volume increase.  (JA495-JA496, JA517-JA518, JA535-JA536, JA542, JA599-JA600, JA602-JA604, JA689-JA690.)  The Union did not indicate that its proposals were "flexible," nor did it suggest that additional concessions would be considered.  The Union had already twice rejected the Company's proposal to mediate, and the Union provided no dates to continue negotiations.  (JA434-JA435, JA487-JA490, JA504, JA540-JA541, JA600-JA601, JA607-JA609, JA613, JA693; JA144; JA219.)  In fact, Maddy stated that he saw "no point" in taking the Company's proposal to the membership and that the parties were "just spinning their wheels."  (JA597.)  Doll admitted that the parties "didn't move the ball very far."  (JA434, JA538, JA605-JA606.)  Mike-sell's offered to meet again on

November 16th—or any other date before the labor agreement expired—but the
Union declined to schedule another session.  (JA434-JA435, JA600-JA601, JA613,
JA693.)  The meeting ended with Maddy and Doll saying that they would get back
to Mike-sell's later.  (JA434-JA435, JA504, JA540-JA541, JA601.)   The Union
did not offer any available dates until November 26th, when the Union finally
proposed a session for December 5th (i.e., 18 days after the contract expired).
(JA434-JA435, JA618.)   These facts pale in comparison to those presented in
*Grinnell*, so the ALJ was not justified in finding that the Union's net sales proposal
on November 14th "opened the door to possible compromises on other issues."
*See Laurel Bay,* 666 F.3d at 1375.

In summary, a preponderance of the relevant, undisputed evidence reflects
that the parties were deadlocked on the three key issues of commissions,
healthcare, and pensions at the time the route sales labor agreement expired.  The
mere fact that the Union made some movement on its commissions proposal
during the parties' last pre-implementation bargaining session does not mean that
no valid impasse existed on November 19th, after both parties refused to move any
further and the Union provided no potential dates to resume bargaining.   The
Company's healthcare and pension proposal had never changed.  (JA499-JA500.)
The Union had never made a single change to its pension proposal; nor has the
Union made a palatable healthcare proposal, refusing to budge on its demand to

continue retiree healthcare.  (JA498, JA500-JA501, JA637-JA640, JA712-JA713, JA733-JA734.)  There was also a huge difference between the parties on the issues of commissions, and neither party indicated a willingness to further move on this issue.  (JA495-JA496, JA517-JA518, JA535-JA536, JA542, JA599-JA600, JA602-JA604, JA689-JA690, JA721-JA722.)   None of the Union's proposals were acceptable to Mike-sell's.  (JA638, JA712-JA713.)

The Union sought to avoid impasse by simply not meeting with Mike-sell's and postponing discussion of key issues, hoping to delay the bargaining process and extend the labor agreements for its benefit.  The Union also flatly refused the Company's request to take its Final Offers to a vote.  But the Union's strategy of inaction only serves to highlight the fact that an impasse existed on the three key economic issues when Mike-sell's implemented the terms of its Final Offers.  *See, e.g., TruServ,* 254 F.3d 1105, 1117-18; *see also Nat'l Gypsum Co.,* 2013 NLRB LEXIS 319, *78-81 (2013) (existence of impasse was supported by union's refusal to take ratification vote or to otherwise indicate willingness to further yield in its position on vital issues).

## II.    The Board's Order Depends On Improperly Admitted Evidence About Post-Implementation Bargaining Sessions.

The parties' post-implementation bargaining sessions are irrelevant to whether an impasse existed on November 19th.  *See, e.g., Laurel Bay,* 666 F.3d at 1375 (post-impasse conduct was irrelevant to whether the parties were at an

impasse on an earlier date). The mere fact that negotiations continue does not mean that an impasse does not exist. *See, e.g., Hi-Way*, 206 NLRB 22, 23. When an impasse in bargaining is reached, the duty to bargain is not terminated but only suspended. *Id.* Impasse, in effect, temporarily suspends the usual rules of collective bargaining by permitting the interjection of new terms and conditions into the employment relationship even though no agreement was reached through negotiations. *Id.* The impasse doctrine is designed, in part, to allow an employer to exert unilateral economic force by establishing new terms and conditions of employment as set out in the employer's proposals. *Id.; see also McClatchy Newspapers, Inc.*, 321 NLRB 1386, 1389-92 (1996). In short, unilateral implementation of an employer's last, best, and final offer is a lawful (and often successful) method for breaking an impasse. *Id.*

It was improper for the ALJ to admit evidence of the parties' post-implementation bargaining sessions. *Laurel Bay,* 666 F.3d at 1375. Mike-sell's vehemently objected to the introduction of such evidence during the hearing in this matter. (JA341-JA343, JA443-JA446, JA456-JA457.) The Union's sudden willingness to meet and make slow movement after the labor agreement expired, and after Mike-sell's had implemented its Final Offers—as well as to raise new issues to quibble over for the first time—is not evidence that the parties were not at impasse on November 19th. If post-implementation bargaining concessions were

- 44 -

probative of whether an impasse existed, then a union could always invalidate an employer's unilateral implementation by waiting until after implementation to make serious movement on key issues. Instead, the Union's post-implementation concessions support a finding of an impasse on November 19th and further demonstrate that, since that impasse and implementation, the Union has tried desperately to show some movement (however superficial) between the parties at each juncture in order to support its unfair labor practice charges.

Not only did the ALJ improperly admit evidence of post-implementation bargaining sessions, but he also failed to properly analyze that evidence. The post-implementation evidence sheds further light on the Union's bad behavior. During the four-month time period after Mike-sell's implemented its Final Offers, the Union raised 14 new issues for the very first time and reinstated many of its original proposals from October 10th. (JA620-JA621, JA629-JA630; JA336, at JA339-JA340.) It was especially suspicious for the Union to raise new issues for the first time after implementation, given that both Maddy and Doll testified that they viewed these particular subjects to be some of the most important issues from the beginning. (JA476-JA477, JA552-JA554.) In addition, in the post-implementation bargaining sessions, the Union suggested for the first time that it may decide not to honor the warehouse and OTR tentative agreements that the parties had previously reached on discrete issues. (JA464-JA470, JA664-JA665.)

- 45 -

The ALJ also failed to recognize that the post-implementation evidence reveals the parties' second bargaining impasse, which cuts off the Company's liability (if any).  (JA751.)  That is, even if the parties were not at impasse on November 19th (which they were), it is clear that the parties did reach impasse on February 13, 2013.  The parties reached a few tentative agreements on February 13th, but no progress was made on the key issues of wages, healthcare, and pensions.   (JA498-JA499, JA626, JA660-662; JA192, at JA194, JA196-JA198, JA200, JA205; JA336, at JA340.)  The ALJ reasoned that "there [wa]s no evidence that [Mike-sell's] notified the Union that it was declaring a new impasse . . . and reimplementing the terms of its full and final offers."  (JA751.)  However, it is undisputed that, during the February 13th meeting, Kazer expressly informed the Union that the parties had "nothing left to discuss;" that "[the offer just presented] was [the Company's] last, best, and final offer;" that Mike-sell's would prepare the offer in written form and present it later that week; and that Mike-sell's "wanted [the Union] to take it to [the membership] for a vote."  (JA660-JA662.)  Whether or not these announcements included the word "impasse," their collective import was the equivalent of declaring an impasse.  This conclusion is supported by the fact that, after the February 13th bargaining session (and before any others), the Union took a strike vote for both bargaining units.  (JA511-JA512.)

Furthermore, February 13th was the last bargaining session when the parties reached agreement on anything; no additional tentative agreements were reached on February 27th or March 20th.  (JA192.)  Mike-sell's made no movement on any issues nor changed its position at all (whether on the three key issues or otherwise) after February 13th.  (JA498-JA499, JA662, JA665-JA667.)  As of the date of hearing in this matter, the parties had around 30 open issues, and all but the three key issues have been raised or revived by the Union since implementation. (JA641-JA659, JA665-JA667; JA336.)  Thus, even if the parties were somehow not at impasse on November 19th (which they were), any alleged damages must be cut off as of February 13th, as there was plainly an impasse on that date. *Dependable Bldg. Maintenance Co.,* 276 NLRB 27, 29-30 (1985) (recognizing that parties can reach more than one impasse in bargaining and that, while initial implementation of employer's final offer was premature, it later became proper due to subsequent impasse, which cut off damages).

## CONCLUSION

For the reasons stated above, the Company's Petition for Review should be granted, the General Counsel's Petition for Enforcement should be denied, and the Board's Order should be reversed because:  (I) the record as a whole contains substantial evidence that the parties *were* at impasse on November 19th; and (II) the ALJ erred in admitting evidence about post-implementation bargaining.  Thus,

- 47 -

the record as a whole does not contain substantial evidence to support the ALJ's credibility assessments, findings, conclusions, remedy, or order.

Respectfully submitted,

*/s/     Jennifer R. Asbrock*
Jennifer R. Asbrock  (0078157)
Eric S. Clark (0071035)
THOMPSON HINE LLP
Austin Landing I
10050 Innovation Drive, Suite 400
Dayton, Ohio  45342-4934
Tel. (937) 443-6849
Fax. (937) 443-6635
Jennifer.Asbrock@ThompsonHine.com
Eric.Clark@ThompsonHine.com

*Counsel for Petitioner and Cross-Respondent, Mike-sell's Potato Chip Company*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and D.C. Circuit Rule 32 because this brief (including signature) contains 11,026 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(a)(1). The undersigned used Microsoft Word 2010 to compute the count.

This brief also complies with the typeface requirement of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced font using Microsoft Word 2010 in 14-point Times New Roman font.

Dated:        November 17, 2014        */s/    Jennifer R. Asbrock*

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2014, I electronically filed the foregoing Brief for Petitioner and Cross-Respondent by using the Court's CM/ECF system, which constitutes service upon the following registered CM/ECF user(s):

Micah Jost
Email: Micah.Jost@nlrb.gov
National Labor Relations Board
(NLRB) Appellate and Supreme Court Litigation Branch
1099 14th Street, NW
Washington, DC 20570-0001

Linda Dreeben, Deputy Associate General Counsel
Email: appellatecourt@nlrb.gov
National Labor Relations Board
(NLRB) Appellate and Supreme Court Litigation Branch
1099 14th Street, NW
Washington, DC 20570-0001

Elizabeth Ann Heaney, Esquire, Attorney
Email: Elizabeth.Heaney@nlrb.gov
National Labor Relations Board
(NLRB) Appellate and Supreme Court Litigation Branch
1099 14th Street, NW
Washington, DC 20570-0001

*Counsel for Respondent and Cross-Petitioner,*
*National Labor Relations Board*


I also served one (1) paper copy of the foregoing Brief, via FedEx, upon each of the above-referenced parties.  I further certify that, pursuant to D.C. Circuit

Rules 25 and 31, eight (8) paper copies of the foregoing Brief will be hand-

delivered to the Clerk of the Court.

                                    /s/    Jennifer R. Asbrock

796500.5

## STATUTORY ADDENDUM TABLE OF CONTENTS

ADDENDUM 1 - 29 U.S.C. § 158. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD-1

ADDENDUM 2 - 29 U.S.C. § 160 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD-8

# ADDENDUM 1

## 29 U.S.C. 158

§ 158.  Unfair labor practices

(a) Unfair labor practices by employer. It shall be an unfair labor practice for an employer--

  (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [29 USCS § 157];

  (2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: Provided, That subject to rules and regulations made and published by the Board pursuant to section 6 [29 USCS § 156], an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;

  (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this Act, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by an action defined in section 8(a) of this Act [this subsection] as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 9(a) [29 USCS § 159(a)], in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 9(e) [29 USCS § 159(e)] within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: Provided further, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this Act;

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a) [29 USCS § 159(a)].

(b) Unfair labor practices by labor organization. It shall be an unfair labor practice for a labor organization or its agents--

(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7 [29 USCS § 157]: Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; or (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances;

(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

(3) to refuse to bargain collectively with an employer, provided it is the representative of his employees subject to the provisions of section 9(a) [29 USCS § 159(a)];

(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--

(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by section 8(e) [subsec. (e) of this section];

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9 [29 USCS § 159]: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

(C) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 9 [29 USCS § 159];

(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work:

Provided, That nothing contained in this subsection (b) shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this Act: Provided, further, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution;

(5) to require of employees covered by an agreement authorized under subsection (a)(3) the payment, as a condition precedent to becoming a member of such organization, of a fee in an amount which the Board finds excessive or discriminatory under all the circumstances. In making such a finding, the Board shall consider, among other relevant factors, the practices and customs of labor organizations in the particular industry, and the wages currently paid to the employees affected;

(6) to cause or attempt to cause an employer to pay or deliver or agree to pay or deliver any money or other thing of value, in the nature of an exaction, for services which are not performed or not to be performed; and

(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:

ADD-3

(A) where the employer has lawfully recognized in accordance with this Act any other labor organization and a question concerning representation may not appropriately be raised under section 9(c) of this Act [29 USCS § 159(c)],

(B) where within the preceding twelve months a valid election under section 9(c) of this Act [29 USCS § 159(c)] has been conducted, or

(C) where such picketing has been conducted without a petition under section 9(c) [29 USCS § 159(c)] being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: Provided, That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 9(c)(1) [29 USCS § 159(c)(1)] or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: Provided further, That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.

Nothing in this paragraph (7) shall be construed to permit any act which would otherwise be an unfair labor practice under this section 8(b) [this subsection].

(c) Expression of views without threat of reprisal or force or promise of benefit. The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit.

(d) Obligation to bargain collectively. For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: Provided, That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification--

   (1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

   (2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

   (3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

   (4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later:

The duties imposed upon employers, employees, and labor organizations by paragraphs (2), (3), and (4) shall become inapplicable upon an intervening certification of the Board, under which the labor organization or individual, which is a party to the contract, has been superseded as or ceased to be the representative of the employees subject to the provisions of section 9(a) [29 USCS § 159(a)], and the duties so imposed shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract. Any employee who engages in a strike within any notice period specified in this subsection, or who engages in any strike within the appropriate period specified in subsection (g) of this section, shall lose his status as an employee of the employer engaged in the particular labor dispute, for the purposes of sections 8, 9, and 10 of this Act, as amended [29 USCS §§ 158, 159, 160], but such loss of status for such employee shall terminate if and when he is reemployed by such employer. Whenever the collective bargaining involves employees of a health care institution, the provisions of this section 8(d) [this subsection] shall be modified as follows:

   (A) The notice of section 8(d)(1) [para. (1) of this subsection] shall be ninety days; the notice of section 8(d)(3) [para. (3) of this subsection] shall be sixty days; and the contract period of section 8(d)(4) [para. (4) of this subsection] shall be ninety days.

   (B) Where the bargaining is for an initial agreement following certification or recognition, at least thirty days' notice of the existence of a dispute shall be given

by the labor organization to the agencies set forth in section 8(d)(3) [para. (3) of this subsection].

  (C) After notice is given to the Federal Mediation and Conciliation Service under either clause (A) or (B) of this sentence, the Service shall promptly communicate with the parties and use its best efforts, by mediation and conciliation, to bring them to agreement. The parties shall participate fully and promptly in such meetings as may be undertaken by the Service for the purpose of aiding in a settlement of the dispute.

(e) Enforceability of contract or agreement to boycott any other employer; exception. It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: Provided, That nothing in this subsection (e) shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: Provided further, That for the purposes of this subsection (e) and section 8(b)(4)(B) [subsec. (b)(4)(B) of this section] the terms "any employer", "any person engaged in commerce or an industry affecting commerce", and "any person" when used in relation to the terms "any other producer, processor, or manufacturer", "any other employer", or "any other person" shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: Provided further, That nothing in this Act shall prohibit the enforcement of any agreement which is within the foregoing exception.

(f) Agreement covering employees in the building and construction industry. It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in section 8(a) of this Act [subsec. (a) of this section] as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 9 of this

Act [29 USCS § 159] prior to the making of such agreement, or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later, or (3) such agreement requires the employer to notify such labor organization of opportunities for employment with such employer, or gives such labor organization an opportunity to refer qualified applicants for such employment, or (4) such agreement specifies minimum training or experience qualifications for employment or provides for priority in opportunities for employment based upon length of service with such employer, in the industry or in the particular geographical area: Provided, That nothing in this subsection shall set aside the final proviso to section 8(a)(3) of this Act [subsec. (a)(3) of this section]: Provided further, That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 9(c) or 9(e) [29 USCS § 159(c) or (e)].

(g) Notification of intention to strike or picket at any health care institution. A labor organization before engaging in any strike, picketing, or other concerted refusal to work at any health care institution shall, not less than ten days prior to such action, notify the institution in writing and the Federal Mediation and Conciliation Service of that intention, except that in the case of bargaining for an initial agreement following certification or recognition the notice required by this subsection shall not be given until the expiration of the period specified in clause (B) of the last sentence of section 8(d) of this Act [subsec. (d) of this section]. The notice shall state the date and time that such action will commence. The notice, once given, may be extended by the written agreement of both parties.

 History:

   (July 5, 1935, ch 372, § 8, 49 Stat. 452; June 23, 1947, ch 120, Title I, § 101, 61 Stat. 140; Oct. 22, 1951, ch 534, § 1(b), 65 Stat. 601; Sept. 14, 1959, P.L. 86-257, Title II, § 201(e), Title VII, §§ 704(a)-(c), 705(a), 73 Stat. 525, 542, 545; July 26, 1974, P.L. 93-360, § 1(c)-(e), 88 Stat. 395, 396.)

ADD-7

# ADDENDUM 2

## 29 U.S.C. 160

§ 160.  Prevention of unfair labor practices

(a) Powers of Board generally. The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 8 [29 USCS § 158]) affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: Provided, That the Board is empowered by agreement with any agency of any State or Territory to cede to such agency jurisdiction over any cases in any industry (other than mining, manufacturing, communications, and transportation except where predominantly local in character) even though such cases may involve labor disputes affecting commerce, unless the provision of the State or Territorial statute applicable to the determination of such cases by such agency is inconsistent with the corresponding provision of this Act [29 USCS §§ 151-158, 159-169] or has received a construction inconsistent therewith.

(b) Complaint and notice of hearing; answer; court rules of evidence inapplicable. Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing before the Board or a member thereof, or before a designated agent or agency, at a place therein fixed, not less than five days after the serving of said complaint: Provided, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made, unless the person aggrieved thereby was prevented from filing such charge by reason of service in the armed forces, in which event the six-month period shall be computed from the day of his discharge. Any such complaint may be amended by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon. The person so complained of shall have the right to file an answer to the original or amended complaint and to appear in person or otherwise and give testimony at the place and time fixed in the complaint. In the discretion of the member, agent, or agency conducting the hearing or the Board, any other person may be allowed to

ADD - 8

intervene in the said proceeding and to present testimony. Any such proceeding shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States [28 USCS Appx] under the rules of civil procedure for the district courts of the United States, adopted by the Supreme Court of the United States pursuant to the Act of June 19, 1934 (U. S. C., title 28, secs. 723-B, 723-C) [28 USCS § 2072].

(c) Reduction of testimony to writing; findings and orders of Board. The testimony taken by such member, agent, or agency or the Board shall be reduced to writing and filed with the Board. Thereafter, in its discretion, the Board upon notice may take further testimony or hear argument. If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this Act [29 USCS §§ 151-158, 159-169]: Provided, That where an order directs reinstatement of an employee, back pay may be required of the employer or labor organization, as the case may be, responsible for the discrimination suffered by him: And provided further, That in determining whether a complaint shall issue alleging a violation of section 8(a)(1) or section 8(a)(2) [29 USCS § 158(a)(1), or (2)], and in deciding such cases, the same regulations and rules of decision shall apply irrespective of whether or not the labor organization affected is affiliated with a labor organization national or international in scope. Such order may further require such person to make reports from time to time showing the extent to which it has complied with the order. If upon the preponderance of the testimony taken the Board shall not be of the opinion that the person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and order dismissing the said complaint. No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause. In case the evidence is presented before a member of the Board, or before an examiner or examiners [administrative law judge or judges] thereof, such member, or such examiner or examiners [judge or judges], as the case may be, shall issue and cause to be served on the parties to the proceeding a proposed report, together with a recommended order, which shall be filed with the Board, and if no exceptions are filed within twenty days after service thereof upon such parties, or within such further period as the Board may

ADD - 9

authorize, such recommended order shall become the order of the Board and become effective as therein prescribed.

(d) Modification of findings or orders prior to filing record in court. Until the record in a case shall have been filed in a court, as hereinafter provided, the Board may at any time upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it.

(e) Petition to court for enforcement of order; proceedings; review of judgment. The Board shall have power to petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceedings, as provided in section 2112 of title 28, United States Code. Upon the filing of such petition, the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board. No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the record. The Board may modify its findings as to the facts, or make new findings, by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which findings with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive, and shall file its recommendations, if any, for the modification or setting aside of its original order. Upon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to

ADD - 10

review by the appropriate United States court of appeals if application was made to the district court as hereinabove provided, and by the Supreme Court of the United States upon writ of certiorari or certification as provided in section 1254 of title 28.

(f) Review of final order of Board on petition to court. Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any court of appeals of the United States in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such court a written petition praying that the order of the Board be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Board, and thereupon the aggrieved party shall file in the court the record in the proceeding, certified by the Board, as provided in section 2112 of title 28, United States Code. Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e) of this section, and shall have the same jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board; the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive.

(g) Institution of court proceedings as stay of Board's order. The commencement of proceedings under subsection (e) or (f) of this section shall not, unless specifically ordered by the court, operate as a stay of the Board's order.

(h) Jurisdiction of courts unaffected by limitations prescribed in 29 USCS §§ 101-110, 113-115. When granting appropriate temporary relief or a restraining order, or making and entering a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part an order of the Board, as provided in this section, the jurisdiction of courts sitting in equity shall not be limited by the Act entitled "An Act to amend the Judicial Code and to define and limit the jurisdiction of courts sitting in equity, and for other purposes," approved March 23, 1932 (U. S. C., Supp. VII, title 29, secs. 101-115).

(i) [Repealed]

(j) Injunctions. The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging

ADD - 11

in an unfair labor practice, to petition any district court of the United States (including the United States District Court for the District of Columbia) [United States district court], within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

(k) Hearings on jurisdictional strikes. Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 8(b) [29 USCS § 158(b)(4)(D)], the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.

(l) Boycotts and strikes to force recognition of uncertified labor organizations; injunctions; notice; service of process. Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B), or (C) of section 8(b) or section 8(e) or section 8(b)(7) [29 USCS § 158(b)(4)(A), (B), or (C), or (e), or (b)(7)], the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any district court of the United States (including the United States District Court for the District of Columbia) [United States district court] within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law: Provided further, That no temporary restraining order shall be issued without notice unless a petition alleges that substantial and irreparable injury to the charging party will be unavoidable and such temporary restraining order shall be effective for no longer than five days and will become void at the expiration of such period: Provided

ADD - 12

further, That such officer or regional attorney shall not apply for any restraining order under section 8(b)(7) [29 USCS § 158(b)(7)] if a charge against the employer under section 8(a)(2) [29 USCS § 158(a)(2)] has been filed and after the preliminary investigation, he has reasonable cause to believe that such charge is true and that a complaint should issue. Upon filing of any such petition the courts shall cause notice thereof to be served upon any person involved in the charge and such person, including the charging party, shall be given an opportunity to appear by counsel and present any relevant testimony: Provided further, That for the purposes of this subsection district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in promoting or protecting the interests of employee members. The service of legal process upon such officer or agent shall constitute service upon the labor organization and make such organization a party to the suit. In situations where such relief is appropriate the procedure specified herein shall apply to charges with respect to section 8(b)(4)(D) [29 USCS § 158(b)(4)(D)].

(m) Priority of cases. Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of subsection (a)(3) or (b)(2) of section 8 [29 USCS § 158(a)(3) or (b)(2)], such charge shall be given priority over all other cases except cases of like character in the office where it is filed or to which it is referred and cases given priority under subsection (l).

 History:

(July 5, 1935, ch 372, § 10, 49 Stat. 453; June 23, 1947, ch 120, Title I, § 101, 61 Stat. 146; June 25, 1948, ch 646, § 32(a), (b), 62 Stat. 991; May 24, 1949, ch 139, § 127, 63 Stat. 107; Aug. 28, 1958, P.L. 85-791, § 13, 72 Stat. 945; Sept. 14, 1959, P.L. 86-257, Title VII, §§ 704(d), 706, 73 Stat. 544, 545; Nov. 8, 1984, P.L. 98-620, Title IV, Subtitle A, § 402(31), 98 Stat. 3360.)